**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ DEC 28 2005 ★

BROOKLYN OFFICE

05 600

SPATT J.

| | |
|---|---|
| MARKET STREET SECURITIES, INC., | |
| Plaintiff | CASE NO: |
| v. | |
| CHARLES F. DOLAN, JAMES L. DOLAN, PATRICK F. DOLAN, MARIANNE DOLAN WEBER, RAND V. ARASKOG, FRANK J. BIONDI, CHARLES D. FERRIS, RICHARD H. HOCHMAN, VICTOR ORISTANO, THOMAS V. REIFENHEISER, JOHN R. RYAN, BRIAN G. SWEENEY, VINCENT TESE, LEONARD TOW | **DERIVATIVE COMPLAINT** |
| Defendants, | |
| and | |
| CABLEVISION SYSTEMS CORPORATION, | |
| Nominal Defendant | JURY TRIAL DEMANDED |

BOYLE M.J.

Plaintiff, by and through its attorneys, derivatively on behalf of Cablevision Systems Corporation ("CVC" or the "Company"), alleges upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through its attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings, news reports, press releases, and other publicly-available documents regarding the issues detailed below on behalf of nominal defendant CVC alleges the following.

## SUMMARY OF THE ACTION

1.      On or about December 20, 2005, the Company announced that it shelved its highly anticipated $3 billion dividend, citing the Company's discovery of what it described as a purported technical violation of at least one of its banking agreement's covenants.

2.      According to published reports in reputable newspapers like *The Wall Street Journal*, problems with the debt covenants surfaced when CVC was preparing to raise $4.5 billion, in part to pay the dividend – approximately 22% of which would flow to Charles Dolan, members of his family and related family entities (collectively referred to herein as the "Dolan Family"), CVC's controlling shareholders.

3.      In addition to driving the Company's stock down, the sudden termination of the planned dividend premised on a breached loan covenant triggered ratings agencies to revise downward their outlook.  For example, Moody's Investors Service revised the debt rating outlook of CVC to "negative" from "stable," citing weak liquidity.  Specifically, Moody's questioned whether CVC was equipped to repay a revolving credit facility from internal sources when it matures in 2006.  Moody's further cut the Company's speculative grade liquidity rating to "SGL-4" from "SGL-2," premised on the covenant violations and cancellation of proposed bank refinancing at CSC Holdings, Inc. – a financing subsidiary of the Company.

4.      The cancellation of the $3 billion dividend marked the latest in a series of strategic mishaps dogging the Company in 2005, resulting from the Company's extremely poor corporate governance and the Dolan Family's domination of both the Company and its Board.

5.      Indeed, 2005 bears witness to CVC undergoing a Board room coup orchestrated by the Dolan Family patriarch – Charles Dolan – so that he could keep alive a failing television satellite system that only he believed was a viable business model, though the majority of the

2

Board and his son James Dolan – also on the Board – considered a "white elephant" bleeding the Company of much needed cash.

6.      2005 also marked the year when the Dolan Family tried to take CVC private at an unfairly low price but saw their plans thwarted in the face of massive shareholder opposition and litigation in Delaware Chancery Court and New York State Supreme Court.

7.      Following the failed effort to take the Company private, the Dolan Family elected to force the Company to pay a special $3 billion dividend to common stockholders.  The problem with this act of purported gratefulness to the Company's shareholders was that it would have resulted in the Dolan Family receiving approximately 22% of the distribution - $634 million – and could only be accomplished if the Company incurred more debt in an amount that violated the Company's preexisting debt covenants.

8.      As discussed more fully below, the Company stated that "human error" caused a technical violation of a bank loan when an $18 million vendor-financing agreement was purportedly misclassified and affected the calculation of the Company's total debt.

9.      Analysts quickly expressed their bewilderment that something as small as an $18 million dollar misclassification could derail a $3 billion dividend and billions in critical financing, and was not discovered or disclosed prior to the Company perfecting its earlier debt issuance.

## PARTIES

10.     Plaintiff Market Street Securities, Inc. is located in Philadelphia, Pennsylvania and is a current holder of CVC common stock who held his stock uninterruptedly during the period of wrongdoing alleged herein.  Accordingly, it has standing to assert these claims on behalf of CVC and will fairly and adequately protect the interests of CVC and its stockholders.

11.     Nominal Defendant CVC is incorporated in the state of Delaware and maintains

its executive offices at 1111 Stewart Avenue, Bethpage, NY 11714-3581.  CVC stock trades on

the New York Stock Exchange under the ticker symbol "CVC." The Company operates through

four segments:  Telecommunications Services, Rainbow, Madison Square Garden, and Rainbow

DBS.  There are currently two classes of common stock:  each share of Class A common stock

has one vote per share and holders are entitled to elect 25% of the Board of Directors; each share

of Class B common stock has ten votes per share and holders are entitled to elect 75% of the

Board of Directors.

12.     Defendant Charles F. Dolan has been the Chairman and a Director of the

Company since 1985.  He was also the Chief Executive Officer from 1985 through October

1995.  He founded and acted as the General Partner of the Company's predecessor from 1973

until 1985 and established Manhattan Cable Television in 1961 and Home Box Office in 1971.

Charles F. Dolan is the father of James L. Dolan, Patrick F. Dolan, Thomas C. Dolan and

Marianne Dolan Weber.  Charles Dolan is a Class B designee to the Board and is not an

independent director.

13.     The Dolan Family together own and/or control approximately 22% of the

Company's outstanding common stock and possess a 71% controlling interest in the Company

through their ownership of the super-voting Class B stock, which gives them the power to elect

at least nine Cablevision directors.

14.     Defendant James L. Dolan has been the President of the Company since June

1998 and the Chief Executive Officer since October of 1995.  He also has been a Director since

1991 and is currently the Chairman of the Executive Committee.  He has been Chairman of

Madison Square Garden, a subsidiary of the Company, since October 1999, was Chief Executive

Officer of Rainbow Media Holdings LLC, a subsidiary of the Company, from September 1992 to October 1995 and Vice President of the Company from 1987 to September 1992. James L. Dolan is the son of Charles F. Dolan and the brother of Patrick F. Dolan, Thomas C. Dolan and Marianne Dolan Weber. James Dolan is a Class B designee to the Board and is not an independent director.

15.     Defendant Patrick F. Dolan has been the President of the Company's News 12 Networks since February 2002 and a Director since 1991. He was Vice President of News from September 1995 to February 2002 and News Director of News 12 Long Island, a subsidiary of the Company, from December 1991 to September 1995. Patrick F. Dolan is the son of Charles F. Dolan and the brother of James L. Dolan, Thomas C. Dolan and Marianne Dolan Weber. Patrick Dolan is a Class B designee to the Board and is not an independent director.

16.     Defendant Marianne Dolan Weber is a Director. She was the President of Dolan Family Foundation from 1986 to September 1999 and Chairman since September 1999. She was President of Dolan Children's Foundation from 1997 to September 1999 and Chairman since September 1999. She has also been the Manager of Dolan Family Office, LLC since 1997. Marianne Dolan Weber is the daughter of Charles F. Dolan, the sister of James L. Dolan, Patrick F. Dolan and Thomas C. Dolan and the sister-in-law of Brian G. Sweeney. Weber is a Class B designee to the Board and is not an independent director.

17.     Defendant Brian G. Sweeney has been a Director since March 2005. He has been the Senior Vice President — eMedia of the Company since January 2000. He is the son-in-law of Charles F. Dolan and brother-in-law of James L. Dolan, Patrick F. Dolan, Marianne Dolan Weber and Thomas C. Dolan. Sweeney is a Class B designee to the Board and is not an independent director.

18.     Defendant Rand V. Araskog has been a Director since March 2005. He is self-employed as a private investor as principal in RVA Investments since March 1998. Mr. Araskog is also a director of ITT Educational Services, Inc., Rayonier, Inc. and International Steel Group, Inc.

19.     Defendant Frank J. Biondi has been a Director since March 2005. He has been a Senior Managing Director of WaterView Advisors LLC since June 1999. Mr. Biondi is also a director of The Bank of New York Company, Inc., Hasbro, Inc., Harrah's Entertainment Inc. and Amgen, Inc.

20.     Defendant Charles D. Ferris has been a Director since 1985. He is a member of the law firm of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. since 1981. He was Chairman of the Federal Communications Commission from October 1977 until April 1981. The Mintz Levin firm has performed substantial legal services for CVC and the Dolan Family for many years and has garnered substantial fees in consideration for these services

21.     Defendant Richard H. Hochman has been a Director since 1986. He is currently Chairman of the Compensation Committee and is a member of the Audit Committee and the Executive Committee. He also has been the Chairman of Regent Capital Management Corp. since April 1995 and was a Managing Director of PaineWebber Incorporated from March 1990 to April 1995. Mr. Hochman is also a director of R.A.B. Enterprises, Inc.

22.     Defendant Victor Oristano has been a Director since 1985 and is currently a member of the Audit Committee. He is the founder and Chairman of Alda Limited Partners, a holding company which has built and operated cable television systems in Connecticut, Florida, New Jersey, Pennsylvania and England since 1966. Mr. Oristano was also the founder of the nation's largest holder of wireless TV frequencies, a company controlled by Alda.

23.     Defendant Thomas V. Reifenheiser has been a Director since 2002 and is the Chairman of the Audit Committee.  Mr. Reifenheiser retired as a Managing Director of JP Morgan Chase, overseeing the Global Media and Telecommunications Division, in September 2000 after 38 years with JP Morgan Chase and its predecessors.  Mr. Reifenheiser is also a director of Lamar Advertising Company, Mediacom Communications Corporation and F&W Publications Inc.

24.     Defendant Vice Admiral John R. Ryan USN (Ret.) has been a Director since 2002 and is a member of the Audit Committee.  He is the President of the State University of New York Maritime College since June 2002 and the Acting Chancellor of the State University of New York since June 2005.  He was the President of State University of Albany from February 2004 to February 2005, Superintendent of the United States Naval Academy from June 1998 to June 2002.  Vice Admiral Ryan's military career included positions as Commander of the Maritime Surveillance and Reconnaissance Force, US Sixth Fleet/Commander, Fleet Air Mediterranean/Commander, Maritime Air Forces, Mediterranean until his retirement from the U.S. Navy in July 2002.  Vice Admiral Ryan is also a director of CIT Group Inc.

25.     Defendant Vincent Tese has been a Director since 1996 and is currently a member of the Audit Committee and the Compensation Committee.  He has been the Director of The Bear Stearns & Co., Inc. since 1994; Mr. Tese served as Chairman and Chief Executive Officer of the New York State Urban Development Corporation from 1985 to 1987 and as Director of Economic Development for New York State from 1987 to December 1994.  Mr. Tese is also a director of Bowne and Company, Inc., Cabrini Mission Society, Catholic Guardian Society, Custodial Trust Co., Gabelli Asset Management, Mack-Cali Realty Corp., Magfusion, Inc., National Wireless Holdings, Inc., Municipal Art Society, Xanboo Inc., Intercontinental

Exchange, Wireless Cable International, Inc. and a trustee of New York Presbyterian Hospital
and New York University School of Law.

26.     Defendant Leonard Tow has been a Director since March 2005. He was the
Director of Citizens Communications Company from 1989 to September 2004 and the Chairman
and Chief Executive Officer of Citizens Communications Company from 1990 to September
2004.

27.     Defendant Directors Araskog, Biondi, Sweeney, and Tow were appointed by
Charles Dolan following his removal of certain directors in early 2005 that were unwilling to
support his business plan and rubber-stamp his bidding. His business plan included salvaging
Voom, the Company's high definition satellite TV service, a project that Wall Street analysts and
members of his own board (including his son James Dolan) were vehemently against. As such,
they are all beholden to Charles Dolan and the other Class B stockholders and cannot be
considered to be independent directors, as detailed below.

## JURISDICTION AND VENUE

28.     This Court has jurisdiction over the subject matter of this action pursuant to 28
U.S.C. § 1332(a) because plaintiff and defendants are citizens of different states and the matter in
controversy exceeds $75,000. This action is not a collusive action designed to confer jurisdiction
on a Court of the United States that it would not otherwise have. This Court also has
supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

29.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a) and 1391(b)
because Nominal Defendant CVC is headquartered in this District, substantially all of the
defendants either reside or conduct business in this District and a substantial portion of the
transactions and wrongs complained of herein occurred in this District.

8

30.     CVC is incorporated in Delaware, but is headquartered in New York, where the center of its operations are located and managed. The CVC executives named as defendants were located in New York, and the alleged wrongdoing occurred at CVC's headquarters in New York, where the bulk of the evidence and civil witnesses relevant to this case are located. CVC has virtually no operations or employees in Delaware, no significant part of the wrongdoing occurred there, no witnesses reside there and no known documentary evidence is located there. Finally, not all defendants named herein are subject to personal jurisdiction in Delaware and a jury trial on these claims is not available under Delaware law or in its Chancery Court.

## OBLIGATIONS OF DIRECTOR AND OFFICER DEFENDANTS

31.     Each of the defendants owed to CVC the duty of loyalty, good faith, due care and diligence in the management and administration of the affairs of the Company and in the use and preservation of its property and assets, and owed the duty of full and candid disclosure of all material facts related thereto. Further, the defendants owed a duty to CVC to ensure that (i) CVC operated in compliance with all applicable federal and state laws, rules, and regulations; and (ii) that CVC did not engage in any unsafe, unsound, or illegal business practices.

32.     To discharge these duties, the defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of CVC. By virtue of their obligations to carry out their duties with the utmost loyalty, good faith, due care and diligence, defendants were required, among other things, to:

     a.  manage, conduct, supervise, and direct the employees, businesses and affairs of the Company in accordance with all applicable laws, rules and regulations, and the Company's charter and by-laws;

9

b.   neither violate nor knowingly or recklessly permit any officer, director or employee of the Company to violate applicable laws, rules and regulations and to exercise reasonable control and supervision over such officers and employees;

c.   ensure the prudence and soundness of policies and practices undertaken or proposed to be undertaken by the Company;

d.   remain informed as to how the Company, in fact, was operating, and upon receiving notice or information of unsafe, imprudent or unsound practices, to make reasonable investigation in connection therewith and to take steps to correct that condition or practice;

e.   supervise the preparation, filing and/or dissemination of any SEC filing, press releases, audits, reports or other information disseminated by the Company and to examine and evaluate any reports of examinations or investigations concerning the practices, products or conduct of officers of the Company and to make full and accurate disclosure of all material facts, concerning *inter alia,* each of the subjects and duties set forth above; and

f.   preserve and enhance the Company's reputation as befits a public corporation and to maintain public trust and confidence in the Company as a prudently managed institution fully capable of meeting its duties and obligations.

## SUBSTANTIVE ALLEGATIONS

33.     Cablevision has consistently stumbled in its decision-making process throughout 2005. The year began on a bad note and culminated with the cancellation of a $3 billion dividend and a $1 billion bond due to a "technical" error. As detailed below, the Company's maladies are not the result of poor business decisions. Instead, they are the direct result of a

10

supine board of directors that has allowed the Dolan family to dominate CVC for years and use their position to enrich themselves to the detriment of both the Company and its stockholders. Indeed, the record unequivocally evidences that the CVC board is not an independent safeguard exercising the requisite level of care necessary to ensure that the Company abides by a prudent set of governance standards.

34.     For example, in the beginning of 2005, the CVC Board of Directors (the "Board") battled over what to do with Voom, its high-definition satellite TV service.  Charles Dolan was in favor of keeping the service, while the rest of the board wanted to sell it or simply shut it down so that it would stop bleeding money.  The Board eventually decided to sell Voom's sole satellite to EchoStar, but this deal was obstructed.

35.     Dissatisfied with his inability to dictate terms to the CVC Board as then constituted, Charles Dolan simply ousted the three directors who defied him with a stroke of a pen and hand-picked new ones willing to back his plans so that he could keep Voom operational despite its terrible business record.  The deal was canceled, and Charles Dolan put up $10 million of his own money to keep Voom running.

36.     Nevertheless, on April 7, 2005, the Board again shifted course bowing to the pressure of James Dolan and agreed to shut down Voom.

37.     During the summer of 2005, the internal struggle, between Charles and James Dolan, to shape the Company's business plan going forward reached a head.  Sensing that the equity markets had beaten the Company's stock down in part because of very public and embarrassing dispute between father and son, the Dolan Family saw an opportunity to take the Company private on the cheap and rid it of certain underperforming assets.

11

38.    Thus, on June 19, 2005, the Dolan Family announced a $7.9 billion offer to take the Company private and spin off its Rainbow Media sports and TV channel unit. It was widely reported that the proposed transaction contemplated taking the Company's most profitable operations private and spinning off to shareholders the Company's under-performing operations.

39.    This deal too was shut down but not because the special committee of the Board turned on the Dolan Family. Instead, all sides agreed that the deal was scuttled because the two sides could not agree on a mutually agreeable price and the Dolan Family withdrew the offer in the face of shareholder litigation and their ultimate unwillingness to pay a fair price to shareholders for the Company.

40.    Having been unable to take the cash producing businesses of the Company private and spin off the less desirable assets, on October 25, 2005, the Dolan Family announced that they instead would direct CVC to pay a $3 billion special dividend to all CVC stockholders. At first glance, this large dividend admittedly benefits all of the shareholders. However, the dividend was self-serving as the Dolan Family stood to gain approximately $634 million in cash from CVC premised on their ownership on Class A stock. In this way, the Dolan Family managed to cause the Company to pay them hundreds of millions of dollars. The problem was that the Company did not have $3 billion in cash sitting on its books to distribute to stockholders. Instead, this massive dividend – that would inure to the Dolan Family's benefit – would be financed by the Company incurring billions in additional debt. In short, the Dolan Family intended to leverage the Company to its maximum capacity and take out as much cash as possible.

41.    On October 31, 2005, *Barron's Online* reported that CVC had only $217 million in cash and would be compelled to borrow the remaining $2 billion plus to pay the special

dividend. This would raise the Company's debt levels to over $11.6 billion. Some Wall Street analysts, including Lehman Brothers' managing director Robert Willens said that the form of the transaction was not akin to a dividend but actually a return-of-capital distribution that would have to be applied against the basis of the holder's stock in calculating capital gains. Given that the Dolan Family's basis in the CVC stock was considerably low, the distribution would have probably been a tax free transaction – not a dividend distribution to the Dolan Family – while other stockholders who did not hold founders' stock would have had to pay taxes on the dividend.

42.       Again, demonstrating a lack of direction, leadership, and that it was wholly dominated by the Dolan Family thereby allowing the $3 billion dividend to be contemplated in the first place, the Board was forced to announce that it would not go through with the dividend after all

43.       On December 19, 2005, just a few days after the Company announced it would finance the dividend with a $1 billion senior note offering, the Board announced that "technical" violations of an $18 million loan covenant prohibited them from issuing the dividend. The Company also announced that the senior note offering was canceled.

44.       In an SEC filing released on December 20, 2005, the Company disclosed that it is "in the process of and intends promptly to complete a comprehensive covenant compliance review, seek waivers under its bank credit agreement and, if necessary, seek waivers under its other debt instruments and consider the impact of such potential covenant violations on the classification of debt in its prior financial statements."

45.       Reporters and analysts do not believe that this small accounting error is the real reason for canceling such a large dividend. TheStreet.com quoted Jake Newman, a Creditsights

analyst as saying, "the company disclosed one technical covenant breach that appears so small that it raised myriad questions among investors as to why the special dividend was canceled rather than just postponed."

46.    Because of this turbulent year, analysts and the public are quickly losing faith in the Company. For example, Moody's Investors Service downgraded the Company's speculative grade liquidity rating to SGL-4, the lowest liquidity rating on the new list, after the most recent announcement. Moody's also cut its outlook on the Company to negative from stable. Standard and Poor's lowered the Company's corporate credit rating from "BB" to "BB-", its third-highest junk rating.

47.    *Bloomberg News* quoted Craig Mofett, an analyst at Sanford C. Bernstein in New York as saying, "This just adds more fuel to the fire for investors, who are wary about the unpredictability of governance at Cablevision. The main thing people want to find out is, if the dividend is off the table, then what comes next?"

48.    Further information has filtered out concerning what Scott Moritz on TheStreet.com calls "Cablevision's credibility gap."

49.    Journalists and critics of the Company alike are convinced there is more to the story than the disclosed "technical" error and have turned their attention to a controversial transaction the Dolan Family engaged in with Bear Stearns.

50.    In February 2000, the Dolan Family trust received $266 million from Bear Stearns in a so-called forward purchase agreement covering 7.98 million shares of CVC. The agreement requires the Dolan Family trust to provide shares in three installments.

14

51.     The Dolan Family, however, has not turned over any shares to satisfy the loan. Further, the Dolan Family negotiated a collar so that they would not be responsible for covering the stock's decline over the intervening years.

52.     At recent prices, the shares pledged under the forward sale are worth about $80 million less than what the family received from Bear Stearns.

53.     The $3 billion dividend and the 22% the Dolan Family were to receive on it would have proven extremely helpful in offsetting the shortfall and repaying the loan.

54.     In addition, other industry analysts speculate that a cash outlay of a $3 billion dividend would have violated the restrictive covenants on its syndicated loans.

55.     One analyst gave the Company demerits for its sloppy management. In a research note Prudential Equity Group analyst Kathy Styponias said she was cutting her Cablevision discounted cash flow valuation by 25% "to reflect management's unpredictable nature." "This latest news causes us to question the internal control structure and oversight functions at the company," Styponias writes in the report.

56.     Craig Moffet, who follows the cable industry for Sanford C. Bernstein & Company, echoed the views of other investors and analysts when he said: "This is business as usual out in Bethpage . . . It is the umpteenth strategic reversal in the last 12 months."

57.     Chris Marangi, a media analyst at Gabelli & Company, whose affiliate, Gamco Investors, owns 21 million shares of Cablevision, said: "The company's reasoning for pulling the dividend does not add up. They have been in the market with the financing deals for some time, and it is unclear why they could not clear the default and continue with the special dividend at a late date. Why did they call it off? Why not just postpone it?"

## DEMAND FUTILITY ALLEGATIONS

58.     Plaintiff has not made any demand upon the Board to bring an action asserting the claims herein, for the damages suffered by CVC, since such demand would be futile, and is therefore excused.

59.     Demand is futile because the board is controlled by the Dolan Family, the people who have committed the wrongdoings.

60.     In fact, five out of the fourteen board members are part of the Dolan Family. Together the Dolan Family own 22% of the Company's stock but have a 71% controlling interest through their ownership of the super-voting Class B stock, affording them the power to elect nine Cablevision directors.

61.     And, as alleged above, four new members were handpicked by Charles Dolan to serve his needs.  Thus, several members of the Board are blatantly beholden to Charles Dolan and would not take any affirmative steps to question his authority or effect governance change that would adversely impact Charles or any member of the Dolan Family.

62.     CVC's maladies are not the result of a poor economic environment or that business decisions simply proved to be unsuccessful.  The Company's troubles are the result of a poorly functioning Board of Directors that has remained supine in the face of the Dolan Family's personal squabbling, palace politics, and efforts to treat the Company as if it were private.

63.     Indeed, the Dolan Family cited public market scrutiny as a reason for wanting to take the Company private.  This was scuttled in the face of shareholder litigation and debate over what price should be paid.  Instead, the Dolan Family elected to keep the Company public but force it to pay a $3 billion cash dividend of which 22% would flow directly to the Dolan Family but had to be financed through the issuance of more debt.

16

64.    Additionally, Director Ferris is beholden to Charles Dolan and in particular, the

Dolan Family. Mr. Ferris has served on the Company's board and enjoyed the perquisites of that

position longer than any director other than defendant Oristano and Charles Dolan himself. Over

the course of his twenty years on the Board, Ferris has been paid well in excess of $2 million and

has received Company stock options worth at least that much. Mr. Ferris has been associated

with the Dolan Family and has financially benefited from that association for two decades, and

as such, Ferris is not an independent director.

65.    Defendant Richard Hochman is also beholden to Charles Dolan and the Dolan

Family. Since 1995 Charles Dolan has had an investment in Regent Equity Partners, a limited

partnership in which Mr. Hochman is one of the general partners. In addition, since 1999

Charles Dolan has had a preferred stock investment in Danskin Inc. Mr. Hochman's spouse has

been the chief executive officer of Danskin Inc. since May 1999. Mr. Hochman, his spouse and

Regent Equity Partners have had a substantial direct or indirect equity investment in Danskin

Inc. since 1997. On December 31, 2004, Mr. and Mrs. Hochman collectively and Charles Dolan

owned, directly or indirectly, approximately 11% and 6 % respectively of the common equity of

Danskin Inc. calculated on a fully diluted as converted basis. Mr. Hochman has received

substantial pecuniary benefits (well in excess of $100,000 per year) for serving on the

Company's board and as a member of the Audit, Compensation and Executive Committees (and

for a time, as chairman of the Compensation Committee) for nearly 20 years. Mr. Hochman has

been associated with the Dolan Family and has financially benefited from that association for

nearly two decades, and as such, Mr. Hochman is not an independent director.

66.    Defendant Victor Oristano is not an independent director. He is the founder and

Chairman of Alda Limited Partners, a holding company which has built and operated cable

television systems in Connecticut, Florida, New Jersey, Pennsylvania and England since 1966. Since 2004, Charles Dolan has had an investment in Reaction Biology Corp., a privately held technology company in which Alda Limited Partners has an investment. Moreover, Matthew Oristano is the son of Victor Oristano and serves as the President and Chief Executive Officer of Alda Limited Partners and has served as Chairman of Reaction Biology since March 2004. Mr. Oristano has received substantial pecuniary benefits (well in excess of $100,000 per year) for serving on the Company's board and the Audit Committee for the past twenty years. Further, upon information and belief, Mr. Oristano maintains social relationships with certain members of the Dolan Family as well. Based on the foregoing, Mr. Oristano's loyalties lie with the Dolan Family, and he is therefore not an independent director.

67. Defendant Thomas V. Reifenheiser is not an independent director. Mr. Reifenheiser retired as a Managing Director of JP Morgan Chase, overseeing the Global Media and Telecommunications Division in September 2000 after 38 years with JP Morgan Chase and its predecessors ("JP Morgan"). JP Morgan has provided services to Cablevision in the past and has sponsored programs with the Radio City Music Hall Rockettes, part of the Cablevision family of companies. JP Morgan is also administrative agent on an August 2004 loan agreement. In 2004 Mr. Reifenheiser enjoyed the perquisites of serving on the board and as Chairman of the Company's Audit Committee.

68. Defendant Vincent Tese is also not an independent director. He has served as a director of Bear Stearns & Co., Inc since 1994. Bear Stearns and/or entities affiliated with it has significant business relationships with the Company and the Dolan Family, including but not limited to acting as the lead underwriter for the Company's secondary offering in October 2001

18

and being party to certain credit agreements and sales plans with the Company and/or Charles

Dolan.

69.     Demand is futile because the Board cannot be presumed to exercise independent

judgment in assessing the merits of a demand, if one were made, due to a majority of the Board's

personal and financial interest in the subject matter of many of the claims raised in this

Complaint.

70.     Indeed, the Company's Proxy admits that the Company is controlled by the Dolan

Family:

> Our Class A common stock is listed on the New York Stock Exchange. As a result, we are subject to most of the New York Stock Exchange's corporate governance listing standards. A listed company that meets the New York Stock Exchange's definition of **"controlled company" may elect not to comply with certain of these requirements.** On March 19, 2004, the Class B stockholders who are members of the Dolan family and related family entities entered into a Stockholders Agreement relating, among other things, to the voting of their shares of our Class B common stock and filed a Schedule 13D with the Securities and Exchange Commission as a "group" under the rules of the SEC. **As a result, we are a "controlled company." As a controlled company, we have the right to elect not to comply with the corporate governance rules of the New York Stock Exchange requiring: (i) a majority of independent directors on our Board; (ii) an independent corporate governance and nominating committee; and (iii) an independent compensation committee.**
> **We have elected not to comply with the New York Stock Exchange requirement for a majority independent board of directors and for a corporate governance and nominating committee because of our status as a controlled company.** We do comply with the requirement for an independent compensation committee. **Our Board elected not to comply with the requirement for a majority independent board of directors because of our shareholder voting structure.** Under the terms of our Amended and Restated Certificate of Incorporation, the holders of our Class B common stock have the right to elect 75% of the members of our Board and there is no requirement that any of those directors be independent.

19

(Emphasis added.)

71.     Indeed, the Company's Proxy cavalierly states how Charles Dolan wields power

over the Board:

> Each current Class A director was elected by the Class A
> stockholders at the last annual meeting. Charles F. Dolan, James L.
> Dolan and Patrick F. Dolan were elected by the Class B
> stockholders at the last annual meeting. On March 2, 2005, Charles
> F. Dolan and certain other Class B stockholders removed three of
> the Class B directors elected at the last annual meeting (William J.
> Bell, Sheila A. Mahony and Steven Rattner) and appointed Rand
> V. Araskog, Frank J. Biondi, John C. Malone and Leonard Tow to
> fill the vacancies created by those removals as well as the vacancy
> created by the death of John Tatta, a Class B director, in February
> 2005. Mr. Sweeney was appointed to the Board by the Class B
> directors on March 7, 2005, to fill the last remaining vacancy on
> the Board.

72.     Non-employee directors are handsomely compensated and even given free cable

television:

> Each non-employee director receives a base fee of $50,000 per
> year; $2,000 per Board and committee meeting attended in person;
> and $500 per Board and committee meeting attended by telephone.
> Non-employee directors also receive $5,000 annually per
> committee membership and $10,000 annually per committee
> chairmanship.
>
> We also pay our non-employee directors compensation in stock
> options and restricted stock units. Each non-employee director
> receives options to purchase 4,000 shares of Cablevision NY
> Group Class A common stock and a number of restricted stock
> units for the number of shares of common stock equal to $40,000
> divided by the fair market value of a share of Cablevision NY
> Group Class A common stock each year the non-employee director
> remains in office. The per share exercise price of each option will
> be equal to the fair market value of the common stock. In general,
> fair market value is determined by taking the average of the high
> and low prices of a share of Cablevision NY Group Class A
> common stock as reported in the consolidated reporting system of
> the New York Stock Exchange on the date of grant.

> Our directors receive free cable television service for their primary residence. Those directors who do not reside in our service territory are reimbursed for the cost of cable television service at their primary residence.

73.     Additionally, the Dolan family uses the Company to employ other family members, including spouses and in-laws, at highly competitive salaries.   According to the Proxy, Kristin Aigner Dolan is a Senior Vice President — Consumer Product Management of the Company.  Ms. Dolan earned a base salary of $279,342 and a bonus of $162,000 in 2004.  The bonus was paid in 2005.  Kristin Aigner Dolan is the spouse of James L. Dolan, the daughter-in-law of Charles F. Dolan and the sister-in-law of Thomas C. Dolan, Patrick F. Dolan and Marianne Dolan Weber.

74.     Moreover, Ms. Aigner Dolan's mother - Rosemary E. Aigner - is employed by the Company as an executive secretary earning a base salary (including overtime) of $80,756 per annum.

75.     Charles F. Dolan employs his brother-in-law Edward Atwood as a Vice President Multimedia of the Company and paid him over $250,000 in 2004.

76.     The Board has only three permanent committees: the Audit Committee, the Compensation Committee and the Executive Committee.

77.     The Audit Committee is comprised of directors Reifenheiser, Hochman, and Oristano and is not independent of the Dolan family.  As detailed above, Charles Dolan and Mr. Hochman are involved in myriad businesses.

78.     For example, since 1995, Charles F. Dolan has had an investment in Regent Equity Partners, a limited partnership in which Mr. Hochman is one of the general partners.

21

79.     Since 1999, Charles F. Dolan has had a preferred stock investment in Danskin Inc.  Mr. Hochman's spouse has been the chief executive officer of Danskin Inc. since May, 1999. Mr. Hochman, his spouse and Regent Equity Partners have had a substantial direct or indirect equity investment in Danskin Inc. since 1997.  As of December 31, 2004, Mr. and Mrs. Hochman collectively, and Mr. Dolan owned, directly or indirectly, approximately 11% and 6%, respectively, of the common equity of Danskin Inc. calculated on a fully diluted, as converted basis.

80.     Since 2004, Charles F. Dolan has had an investment in Reaction Biology Corp., a privately held technology company, in which Alda Limited Partners, a holding company of which Mr. Oristano is the Founder and Chairman, has an investment.  Matthew Oristano is the son of Victor Oristano and serves as the President and Chief Executive Officer of Alda Limited Partners and has served as Chairman of Reaction Biology since March 2004.

81.     Demand is excused because the unlawful acts and practices alleged herein cannot be defended by the defendants and are not subject to the protection of any independent business judgment.  Because it would undoubtedly benefit CVC to recover the damages caused by these defendants' wrongdoing, and to assert these derivative claims, it would be an exercise in futility to make a demand on the Directors.

82.     Demand is also excused because the defendants participated in, approved and/or permitted the wrongs alleged herein, concealed or disguised those wrongs or recklessly and/or negligently disregarded them, and are therefore not disinterested and lack sufficient independence to exercise business judgment as set forth herein.

## COUNT I
## DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY
### (AGAINST ALL DEFENDANTS)

83.     Plaintiff incorporates by reference all paragraphs above as if set forth herein.

84.     Defendants all owed the fiduciary duties of loyalty and good faith to CVC and its stockholders, including the duty to exercise due care and diligence in the management and administration of the affairs of the Company, and owed the duty of full and candid disclosure of all material facts thereto.

85.     As fiduciaries, to discharge these duties, the defendants were required to exercise prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of CVC.

86.     The defendants' breaches of their fiduciary duties have proximately caused, and will continue to cause, CVC to suffer substantial monetary damages as a result of the wrongdoing described herein, as well as further and even greater damage in the future, including damage to CVC's reputation, business and good will.

87.     CVC has been directly and substantially injured by reason of the defendants' intentional breach and/or reckless disregard of their fiduciary duties to the Company.  Plaintiff, as a shareholder and representative of CVC, seeks damages and other relief for the Company, in an amount to be proven at trial.

## COUNT II
## DERIVATIVE CLAIM FOR CONTRIBUTION AND INDEMNIFICATION
### (AGAINST ALL DEFENDANTS)

88.     Plaintiff incorporates by reference all paragraphs above as if set forth herein.

89.     CVC is alleged to be liable to various persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein to give rise to the defendants' liability to CVC.

90.     In addition, the defendants' misconduct and wrongdoing, and the disclosures and events described herein, have had, and will continue to have, a series of deleterious effects on CVC, including but not limited to loss of confidence of the investing public in the integrity and management of CVC, thereby resulting in CVC losing market value.

91.     CVC's alleged liability arises, in whole or in part, from the intentional, knowing, reckless, disloyal and bad faith acts or omissions of the defendants as previously alleged herein.

92.     CVC is therefore entitled to contribution and indemnification from each of the defendants in connection with all such claims that have been, are or may in the future be asserted against CVC by virtue of defendants' misconduct and wrongdoing.

## PRAYER FOR RELIEF

93.     WHEREFORE, Plaintiff, on its own behalf, and derivatively on behalf of CVC, prays for judgment as follows:

    a.  As to Count I, Breach of Fiduciary Duty, against all the defendants:

        i.  an award of monetary damages to Plaintiff, on behalf of CVC, against all of the defendants, for all losses and/or damages suffered by CVC as a result of the wrongdoings complained of herein, together with prejudgment and post-judgment interest thereon, in an amount to be proved at trial.

    b.  As to Count II, Contribution and Indemnification, against all the defendants:

        i.  contribution and indemnification from each of the defendants in connection with all such claims that have been, are or may in the future be asserted against CVC by virtue of defendants' misconduct and wrongdoing alleged herein.

    c.   Awarding Plaintiff the fees and expenses incurred in this action, including

        reasonable allowance of fees for Plaintiff's attorneys and experts; and

    d.   Granting Plaintiff such other and further relief as the Court may deem just and

        proper.

Dated: December 28, 2005

By: _____

Gregory Mark Nespole (GN 6820)
Matthew M. Guiney (MG 5858)
WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
270 Madison Avenue
New York, NY 10016
212-545-4657
Nespole@whafh.com
Nespole@bloomberg.net

## VERIFICATION

I, Stephen Cheseldine declare that I have reviewed the Complaint ("Complaint"), and I authorize its filing on behalf of Market Street Securities. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of common stock during the time period in which the wrongful conduct alleged and complained of in the Complaint was occurring.

12-21-05
Date

Market Street Securities
Stephen Cheseldine